UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FOR ONLINE PUBLICATION

```
┌─────────────────────────────────────────┐
│ EWA PALAK,                               │
│                         Plaintiff,       │
│                                          │
│             - versus -                   │
│                                          │
│ ST. FRANCIS HOSPITAL,                    │
│                         Defendant.       │
└─────────────────────────────────────────┘
```

MEMORANDUM
AND ORDER
14-CV-4383

A P P E A R A N C E S:

> EWA PALAK
> > 2230 Harman Street
> > Ridgewood, NY 11385
> > *Pro Se Plaintiff*
>
> NIXON PEABODY LLP
> > 50 Jericho Quadrangle
> > Suite 300
> > Jericho, NY 11753
> By:    Christopher G. Gegwich
> > Tania Mistretta
> > *Attorneys for Defendants*

JOHN GLEESON, United States District Judge:

   *Pro se* plaintiff Ewa Palak brought this lawsuit against her former employer, St.

Francis Hospital ("the Hospital"), alleging that it unlawfully discriminated against her on

account of her age and national origin and subjected her to harassment and retaliation in

violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in

Employment Act ("ADEA").  Palak, who is 54 and Polish, worked for the Hospital as a part-time

Comfort and Care Provider ("CCP") for five years until the time of her resignation in the fall of

2014.

On September 27, 2013, Palak filed a complaint with the New York State Division of Human Rights ("the NYSDHR complaint") alleging that the Hospital subjected her to discrimination and a hostile work environment based on her national origin and age. After an investigation into the allegations, the NYSDHR issued an order on March 21, 2014 finding no probable cause to believe that the Hospital had engaged in discriminatory practices. On April 7, 2014, Palak submitted a letter to the EEOC seeking review of the NYSDHR's determination. The EEOC adopted the NYSDHR's findings and issued a Notice of Right to Sue on April 22, 2014. Palak filed the original complaint in this case on July 8, 2014 and her second amended complaint on November 12, 2014. The Hospital filed a motion for summary judgment on March 31, 2015. Palak filed a cross-motion for summary judgment on May 8, 2015. I heard oral argument on May 15, 2015. For the reasons explained below, the Hospital's motion is granted and Palak's motion is denied.

## BACKGROUND

The following facts are taken from Local Rule 56.1 statements and supporting materials submitted by the parties. Each side has moved for summary judgment. Unless otherwise noted, these facts are either not in dispute or are construed in the light most favorable to the party opposing the motion under consideration.

The Hospital, a member institution of the Catholic Health Services of Long Island health care system, is a not-for-profit corporation located in Roslyn, New York. It is a designated cardiac center, with specialties in heart surgery, cardiac catheterization and angioplasty, and the diagnosis and treatment of abnormal heart rhythms. In each of the different departments at the Hospital, the Registered Nurses ("RN") work alongside nurse aides, including Patient Care Associates ("PCA") and CCPs.

Palak began working as a part-time CCP in the Hospital's 2 East DeMatteis Department ("2 East Unit") on September 8, 2009. At the time, she was 48 years old. As a CCP, Palak assisted the Hospital's RNs and PCAs, and her responsibilities included bathing patients, assisting patients with toileting and ambulating, changing patients' linen, emptying linen bins, providing patients with food and fresh water, answering call bells, making safety rounds, taking vital signs, and generally keeping patients' rooms clean and tidy.

Patrice Keenan, R.N., is the Nurse Manager responsible for supervising all of the nursing employees in the 2 East Unit. Palak's immediate supervisors during her employment were Assistant Nurse Managers Christine Rice, R.N., and Susan Gunaydin, R.N., who both, in turn, reported to Keenan.

A.    *Palak's Disagreement with Her Performance Evaluations*

Much of Palak's claim seems to center on her disagreement with the performance evaluations she received during the course of her employment, which she perceived to be negative.

The Hospital conducts annual performance evaluations for all of its employees that are based on the Assistant Nurse Managers' personal observations and interactions with employees, as well as input from other managers, RNs and supervisory employees. Once a draft of a written performance evaluation is completed, it is given to Keenan for her final review and approval. Rice and Gunaydin were responsible for preparing and delivering Palak's annual performance evaluation.

In October 2010, Rice prepared Palak's written performance evaluation for the 2009 to 2010 time period ("the 2010 evaluation"), with Gunaydin and Keenan's help. Palak's overall performance for the time period was rated as "Meets" expectations: she received a rating

3

of "Meets" expectations in 46 categories, a rating of "Exceeds" expectations in nine, and a rating of "Needs Improvement" in two. Rice Aff., Ex. A. The evaluation also included several constructive "Goals/Objectives," which included that she should work to increase patient satisfaction to help the 2 East Unit achieve a Press Ganey score higher than 90%.[1]

Rice met with Palak on October 4, 2010 to discuss her performance and present her with a copy of her evaluation. Palak was unhappy with her performance evaluation, and Rice claims that Palak became extremely defensive. Rice Aff. ¶ 19. Palak refused to sign the 2010 evaluation and later scheduled a meeting with Keenan to discuss her disagreement with it.

At the meeting with Keenan, Palak expressed disagreement with the two areas in which she received a "Needs Improvement" rating and tried to negotiate a higher performance rating. She also expressed displeasure that improving the 2 East Unit's Press Ganey score was included as a goal in her evaluation for the coming year. Keenan Aff. ¶ 26. Keenan declined to change Palak's evaluation because it accurately reflected her performance.

A year later, on October 25, 2011, Palak met with Katie O'Brien, formerly a Human Resources Business Partner at the Hospital, to express concerns about Rice, stating that she felt that Rice could be "angry, hostile, and rude towards her." She further stated that she did not feel Keenan had dealt with her concerns about Rice fairly after Palak brought them to her attention. Palak also told O'Brien that Keenan had told her she was not a "team player." Palak did not complain of discrimination on the bases of age or national origin, harassment or retaliation at this meeting.

---

[1]    Press Ganey is a consulting firm that conducts surveys of patients who received treatment at hospitals and other healthcare institutions. The Hospital works with Press Ganey to perform surveys to determine patient satisfaction with the quality of the patient care provided by the Hospital. Each employee working in a particular unit is responsible for the unit's overall Press Ganey score.

On October 26, 2011, O'Brien contacted Keenan and asked Keenan to speak with the Nurse Managers and to make an effort to be more sensitive to Palak's perception of how her performance was addressed, which Keenan did. O'Brien Aff., Ex. H; Keenan Aff. ¶ 34. O'Brien informed Palak about her conversation with Keenan the following day, and asked Palak to contact her if she had additional concerns in the future.

The next month, in November 2011, Rice prepared Palak's written performance evaluation for the 2010 to 2011 time period ("the 2011 evaluation") in collaboration with Gunaydin and Keenan.[2] Rice Aff., Ex. B; Gunaydin Aff. ¶ 17 ("Gun. Aff."); Keenan Aff. ¶ 38. Palak received a final performance rating of 2.2, which indicated a ranking between "Sometimes Meets Expectations" and "Meets Expectations." The 2011 evaluation noted that Palak "[wa]s encouraged to work with the PCAs and RNs collaboratively in order to facilitate patient care" and that although she accepted her assigned tasks, she needed to "realize that she is a team member and that all staff members work together to provide best patient outcomes." She was also encouraged to better accept constructive feedback.

Gunaydin met with Palak on November 27, 2011 to review her performance and provide her with a copy of the 2011 evaluation. Palak became defensive after reviewing the evaluation and refused to sign it. After her meeting with Gunaydin, Palak requested a meeting with Keenan to discuss the 2011 evaluation. Palak stated to Keenan that the evaluation was "negative" and that she did not deserve this rating. Keenan met with Palak on multiple occasions in an effort to explain to Palak that her evaluation was not negative. Keenan Aff. ¶ 40. She advised Palak that she would not change the ratings in her written performance evaluation based on Palak's self-assessment of her own performance. *Id.* ¶ 41.

---

[2]     Between 2010 and 2011, the Hospital implemented a new performance evaluation ranking system that measured employees' performances on a 5-point numerical scale. Rice Aff., Ex. B.

In September 2012, Gunaydin prepared Palak's written performance evaluation for the 2011 to 2012 time period ("the 2012 evaluation"), with input from Rice and Keenan. Gun. Aff. ¶ 22 & Ex. A. Palak received a final performance rating of 2.3, which again set her between "Sometimes Meets Expectations" and "Meets Expectations." The 2012 evaluation noted that she "continue[d] to work as an individual and not as a team." Gun. Aff., Ex A.

Gunaydin met with Palak to present her with her 2012 evaluation, and contends that Palak became argumentative and refused to sign her evaluation. Gun. Aff. ¶ 28. Palak scheduled a meeting with Keenan to discuss the 2012 evaluation. Keenan Aff. ¶ 52. Because Keenan perceived Palak to be increasingly agitated about her performance evaluations, Keenan arranged for another manager, Leah Apil, R.N., to be present. *Id.* During the meeting on November 8, 2012, Keenan and Apil spoke with Palak about the areas of her performance which needed improvement. *Id.* ¶ 54. Palak wanted to discuss her prior written evaluations instead. *Id.*

Sometime after the meeting with Keenan and Apil, Palak contacted Bernadette Cantazaro in the Hospital's Corporate Compliance Department, claiming that the Hospital was subjecting her to "retaliatory behavior" and a "hostile work environment." Catanzaro referred the matter to O'Brien. On December 18, 2012, Palak met with O'Brien regarding the concerns she had brought to Catanzaro's attention. At this meeting, Palak questioned all of her prior performance evaluation ratings and complained that when she tried to speak with Keenan, Rice or Gunaydin regarding her performance, they became angry and hostile. Palak claimed that the Nurse Managers made looks and acted like they were laughing at her expense. O'Brien Aff., Ex. N.

O'Brien subsequently discussed the matter with Keenan and concluded that there were no facts or circumstances suggesting that the Hospital had subjected Palak to retaliation or a hostile work environment. *Id.* Palak's concerns related to her dissatisfaction with her written performance evaluation ratings seemed to stem from a miscommunication with her supervisors. *Id.* O'Brien notified Palak that Keenan was available to meet with her and further discuss her written performance evaluation, but that the Hospital would not change her overall performance ratings.

Palak did not complain about age or national origin discrimination during her November 2012 conversation with Catanzaro or her December 2012 meeting with O'Brien, and she did not attribute the alleged harassment or hostile work environment to her age or national origin.

On March 25, 2013, Keenan met with Palak to discuss Palak's disagreement with her 2012 evaluation. She explained to Palak that the evaluations accurately reflected her performance as a CCP. Keen. Aff. ¶ 61.

On May 29, 2013, Palak contacted O'Brien to schedule a meeting to review her personnel file. O'Brien had to cancel the meeting which was scheduled for June 6, 2013, and Palak emailed her on July 1, 2013 to reschedule it. Palak attached several documents relating to her interactions with Keenan and other co-workers to the email. O'Brien promptly began an investigation into the issues raised in the documents.

In one of the documents in the email, entitled "Some Employees Behavior May Need Attention," Palak made a number of allegations regarding her co-workers claiming that they engaged in various forms and types of inappropriate behavior and misconduct, none of which were directed towards or involved Palak, including an alleged incident involving Keenan

and Shanielle Smith, a PCA in the 2 East Unit. Palak alleged that, on March 4, 2013, Smith said to Keenan, in sum or substance, "fire Jack and hire a young man" about Jack Laskin, a CCP at the time. She alleged that Keenan laughed at the comment. O'Brien spoke with Keenan and Smith, and both denied that Smith ever made that comment about Laskin. O'Brien Aff. ¶ 44.

At the conclusion of her investigation, O'Brien determined that Palak's allegations of misconduct and inappropriate conduct involving her co-workers were unfounded. O'Brien Aff. ¶ 43.

On January 31, 2014, Palak met with Gunaydin in her office to go over her performance evaluation for the 2012 to 2013 time period ("the 2013 evaluation"). Two other Nurse Managers were also present. Palak received rating of 2.8, which was higher than her previous two evaluations, and again set her between "Sometimes Meets Expectations" and "Meets Expectations." Upon receipt of her written performance evaluation and before anything was said, Palak began crying.

Palak claims that she demanded to leave the meeting and that Gunaydin blocked her exit. Second Amended Compl. ("SAC") at 7. Her complaint states that she was confined against her will for approximately one hour, and that she feared for her safety. *Id.* In her deposition testimony, however, Palak explained that she thinks she attempted to leave the meeting on two occasions by standing up and asking to leave. Pl. Dep. at 124-25, 134-35, 137-40, 142, 147. Gunaydin responded by asking her to sign her performance evaluation, explaining that the evaluation was not negative, and stating that the meeting was not over once. *Id.* The door to the office was closed during the meeting, but unlocked, and Palak was free to leave at any time. Feil Aff. ¶¶ 7, 9; Gun. Aff. ¶¶ 35, 38, 40; Helmke Aff. ¶¶ 7, 10, 14.

B.      *Request for Time Off*

In late October 2011, Palak asked to take off a day of work after she had been scheduled to work that particular day; Keenan denied the request. Palak later explained to Keenan that she needed the day off to attend her daughter's graduation from military boot camp, at which point Keenan arranged for another employee to cover Palak's shift and allowed Palak to take the day off without pay. Keen. Aff. ¶ 43. Palak's daughter was not on active duty or being deployed to a foreign country at the time.

C.      *Palak's Applications for Other Positions at the Hospital*

In October 2010, Palak applied for a PCA position in the Electrophysiology Department ("ED") at the Hospital. Keenan endorsed Palak's application (*i.e.*, she recommended and approved Palak for the position). Palak interviewed with Regine Bernstein from the ED for the position on November 23, 2010. She did not perform well in the interview and therefore was not selected for the position. O'Brien Aff., Ex. D.

In January 2011, Palak applied for several open PCA positions in various departments in the Hospital, including the 3 East Medical Intensive Care Unit ("3 East MICU"). Again, Keenan endorsed Palak's applications. On February 2, 2011, Palak interviewed with Elaine Stevens, R.N., from the 3 East MICU. In her interview notes, Stevens noted that Palak appeared overwhelmed by the fact that there was only one PCA and one CCP on shift at night in the 3 East MICU. O'Brien Aff., Ex. F. Stevens also noted that the PCA in the 3 East MICU would have to frequently draw blood, and she preferred to hire someone with more experience. *Id.* Thus, Stevens did not select Palak for the PCA position in the 3 East MICU. *Id.* Stevens was the same person who initially interviewed and hired Palak in 2009 as a CCP in the 2 East Unit.

On October 29, 2012, Palak submitted applications for two PCA positions at the Hospital. Keenan again endorsed Palak's applications. The Hospital did not select Palak for one of the positions (MICU-2 PCA), and instead chose a candidate with more experience. O'Brien Aff., ¶ 28. Keenan, Gunaydin and Rice were not involved in that hiring. Gun. Aff. ¶ 49; Keen. Aff. ¶ 45; Rice Aff. ¶ 46. Palak was not selected for the other available PCA position in 2 East Unit. The Hospital had hired a former employee who was returning from military absence on the day Palak submitted her application. O'Brien Aff. ¶ 27 & Ex. I. This was the last time Palak applied for a PCA position at the hospital.

D.     *Denial of Salary Increase*

Palak alleges that in 2013, Keenan did not recommend a salary increase for the 2011 to 2012 review period. Keenan was not involved in deciding the salary increases in 2013, however, as the decisions were handled by Tara Anne Rogan, R.N., the Nurse Manager for the Froehlich Pavilion 2 Unit. Keen. Aff. ¶ 93; Rogan Aff. ¶ 5. Salary increases are not automatic, and Rogan based her decision solely on Palak's 2012 evaluation since she does not know Palak. Rogan Aff. ¶ 4-8.

E.     *Alleged Harassing and Discriminatory Comments*

Palak alleges two incidents during which discriminatory comments were made by Hospital personnel. First, she claims that sometime in 2011, Smith allegedly mimicked her Polish accent in Rice's presence and Rice giggled. Pl. Dep. at 81-85, 86, 90, 100-101. Second, Palak claims that Keenan made certain comments about Laskin, which she claims were the product of age-related animus. *Id.* at 71-76. Specifically, Palak alleges that sometime in April 2013, Keenan stated, "Who is walking whom?" when observing Laskin walking a patient. The second statement regarding Laskin is the one she raised in the document "Some Employees

Behavior May Need Attention," when Smith allegedly stated "fire Jack and hire a young man" to Keenan. The Hospital denies any of the comments were made.

Palak also alleges that a nurse had referred to her as a "jerk" when speaking to Keenan sometime in 2011.

F.    *Other Allegedly Adverse Employment Actions*

In addition to receiving what she characterizes as "negative" performance evaluations, Palak also alleges that she was given the undesirable assignment of emptying bed linens, and that the Hospital did not accommodate her schedule for school. CCPs and PCAs routinely empty beds linens. Pl. Dep. at 180-81. Some of Palak's requests for days off to attend school in the fall of 2011 were denied due to the Hospital's staffing needs. Rice Aff. ¶ 28. Her requests for days off to attend school in 2012 and 2013 were granted.

G.    *Palak's Resignation*

On September 24, 2014, Palak requested a personal leave of absence from October 12, 2014 through November 19, 2014, which the Hospital approved. On November 19, 2014, Palak sent the Hospital's Director of Human Resources an email resigning from her employment with the Hospital. She cited the Hospital's "long time discriminatory, retaliatory and humiliative actions" as her reason for resigning. Gegwich Decl., Ex. P. She claimed to be suffering from severe depression because of the Hospital's actions. *Id.* Palak's resignation was accepted by letter the following day. *Id.* at Ex. Q. The Hospital's letter encouraged her to seek confidential counseling to help her cope with her distress or depression. *Id.*

DISCUSSION

A.    *Legal Standards*

    1.    *Summary Judgment*

Under Federal Rule of Civil Procedure 56(a), a court will grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if its resolution "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (quoting *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997)).

The court must review the record as a whole and, in doing so, "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (citation omitted). As such, "the court should give credence to the evidence favoring the nonmovant as well as the evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* (citation and internal quotation omitted).

A district court must exercise caution in granting summary judgment in employment discrimination cases, which typically turn on the employer's subjective intent. *See Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008); *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997); *see also Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir. 1984) ("where

12

subjective issues regarding a litigant's state of mind, motive, sincerity or conscience are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable[.]"). This is because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006). However, even in the discrimination context, a plaintiff cannot elude summary judgment with mere conclusory allegations as to the employer's motive. *See Holcomb*, 521 F.3d at 137; *ITC Ltd. V. Punchgini, Inc.*, 482 F.3d 135, 150 (2d Cir. 2007) ("[I]ntent is always a subjective matter of inference and thus rarely amenable to summary judgment. At the same time, however, the summary judgment rule would be rendered sterile if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."(quotations and citations omitted)).

2.    *Discrimination Claims Under Title VII and The ADEA*

In evaluating summary judgment motions with respect to discrimination claims brought pursuant to Title VII and the ADEA, courts apply the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Paulino v. New York Printing Pressman's Union, Local Two*, 301 F. App'x 34, 37 (2d Cir. 2008). This framework requires a plaintiff to show: (1) that she belongs to a protected class; (2) that her job performance was satisfactory; (3) that she suffered adverse employment action; and (4) that the action occurred under conditions giving rise to an inference of discrimination. *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006) (citing *McDonnell Douglas*, 411 U.S. at 802). Once the plaintiff has made a prima facie case, the burden shifts to the defendant employer to provide a legitimate, non-discriminatory reason for the action. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802-04). If the defendant makes such a showing, the burden shifts back to the plaintiff to prove

discrimination, for example, by showing that the employer's proffered reason is pretextual. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804). With respect to an ADEA claim, the plaintiff must establish that "age was the 'but-for' cause of the challenged adverse employment action" at this last stage. *Gross v. FBL Financial Services*, 557 U.S. 167, 180 (2009).

a. *Stray Remarks Insufficient to Establish Prima Facie Case*

"In the absence of a clearly demonstrated nexus to an adverse employment action, stray workplace remarks are insufficient to defeat a summary judgment motion." *Almonord v. Kingsbrook Jewish Med. Ctr.*, No. 04-CV-4071 (NGG)(RML), 2007 WL 2324961, at *9 (E.D.N.Y. Aug. 10, 2007) (citing *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998). "[T]he stray remarks even of a decision-maker, without more, cannot prove a claim of employment discrimination[.]'" *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001). When coupled with "other indicia of discrimination," however, the remarks might no longer be "stray" and the jury may accord them a more ominous significance. *Id.* (quotation and citation omitted). "In considering whether a remark is probative of discrimination or whether it is a non-probative 'stray remark,' a court should consider factors such as: '(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (*i.e.*, whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (*i.e.*, whether it was related to the decision-making process).'" *Sethi v. Narod*, 12 F. Supp. 3d 505, 539 (E.D.N.Y. 2014) (quoting *Henry v. Wyeth Pharmaceuticals*, 616 F. 3d 134, 149 (2d Cir. 2010)).

b.        *Inference Against Discrimination*

Courts recognize that an "inference against discrimination exists where the person who participated in the allegedly adverse decision is also a member of the same protected class." *Drummond v. IPC Int'l., Inc.*, 400 F. Supp. 2d 521, 532 (E.D.N.Y. 2005).   In other words, "[i]f a decision maker is in the same protected class as plaintiff, claims of discrimination become less plausible."  *Chan v. Donahue*, No. 13-CV-2599 (JBW), 2014 WL 6844943, at *19 (E.D.N.Y. Dec. 4, 2014); *see also Williams v. Brooklyn Union Gas Co.*, 819 F. Supp. 214, 225 (E.D.N.Y. 1993) (dismissing age discrimination claims where the employees responsible for plaintiff's termination were the same age as or older than plaintiff).  However, this is not dispositive, given that persons of a protected class are capable of discriminating against members of the same class; it merely provides an additional inference against discrimination that a plaintiff must overcome.  *See Drummond*, 400 F. Supp. at 532 (the inference against discrimination where the person who allegedly discriminated is a member of the same protected class "does not end the inquiry").

3.        *Retaliation Claim Standard*

The *McDonnell Douglas* burden-shifting framework "applies to claims . . . of retaliation under Title VII and the ADEA."  *Bucalo v. Shelter Island Union Free School Dist.*, 691 F.3d 119, 129 (2d Cir. 2012).  The Second Circuit has described the first stage of the retaliation burden-shifting analysis as follows:

> First, the plaintiff must establish a prima facie case of retaliation by showing: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.  The plaintiff's burden in this regard is *de minimis*, and the court's role in evaluating a summary judgment request is to

determine only whether proffered admissible evidence would be sufficient
to permit a rational finder of fact to infer a retaliatory motive.

*Hicks v. Baines*, 593 F.3d 159, 164-65 (2d Cir. 2010) (internal quotation marks and citations

omitted).

    4.     *Hostile Work Environment Standard*

        To establish a hostile work environment claim, a plaintiff must show "(1) that the

harassment was sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment, and (2) that a specific basis exists for

imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d

Cir. 2002) (internal quotations and citation omitted).  The conduct at issue must be "so severe or

pervasive as to create an objectively hostile or abusive work environment." *Richardson v. New

York State Dep't of Correctional Serv.*, 180 F.3d 426, 436 (2d Cir. 1999) (internal quotations and

citation omitted).   "A work environment will be considered hostile if a reasonable person would

have found it to be so and if the plaintiff subjectively so perceived it." *Brennan v. Metro. Opera

Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999).  Whether a reasonable person would find a given work

environment hostile depends on the "totality of the circumstances," including: (1) frequency of

the conduct, (2) its severity, (3) whether the conduct is physically threatening or humiliating, or a

mere offensive utterance, and (4) whether the conduct unreasonably interferes with the

employee's work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

    5.     *False Imprisonment Standard*

        To prevail on a claim for false imprisonment under New York law, a plaintiff

must establish (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious

of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement

was not otherwise privileged. *King v. Crossland Sav. Bank*, 111 F.3d 251, 255 (2d Cir. 1997).

B.  *Application*

1.  *The Timeliness Requirement*

The Hospital argues that most of Palak's Title VII claims are time-barred.  In

states that have a fair employment agency, such as New York, plaintiffs may only assert claims

under Title VII alleging discrete discriminatory acts that have occurred within 300 days of filing

a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  42

U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113-14 (2002);

*Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 126 (2d Cir. 2010) ("[I]n states such as

New York that have an agency with the authority to address charges of  the statute of limitations

for filing a charge of discrimination with the Equal Employment Opportunity Commission is 300

days discriminatory employment practices." (alteration, citation and internal quotation marks

omitted)).  In *Morgan*, the Supreme Court held that "discrete discriminatory acts are not

actionable if time barred, even when they are related to acts alleged in timely filed charges."  536

U.S. at 113.  The claims will not be time-barred, however, "as long as all acts . . . are part of the

same unlawful employment practice and at least one act falls within the [300 day] time period."

*Id.* at 122.

Palak filed her discrimination complaint with the NYSDHR on September 27,

2013.  Thus, all of her Title VII claims concerning conduct that took place prior to December 2,

2012 are time-barred unless she can establish a basis for extending the limitations period under

the continuing violation doctrine, which she has not.[3]  *See Robles v. Cox & Co.*, Inc., 841 F.

Supp. 2d 615, 627 (E.D.N.Y. 2012) ("the continuing violation doctrine extends the limitations

---

[3]      Specifically, Palak's last application for a PCA position was on October 29, 2012, thus her failure to promote and transfer claims are untimely.  Also, her allegedly "poor" performance evaluations for 2010, 2011 and 2012, the undesirable or increased work assignments, the Hospital's failure to approve days off for her to attend school or her daughter's military ceremony, and the assignment of certain duties and responsibilities, all occurred prior to December 2, 2012, and are therefore time-barred.

period for all claims of discriminatory acts committed under an ongoing policy of discrimination even if those acts, standing alone, would have been barred by the statute of limitations" (internal quotations and citations omitted)).  Specifically, the alleged discriminatory acts, even if true, do not establish an ongoing policy of discrimination by the Hospital.  "It is well-settled that certain adverse employment practices such as termination, failure to promote or adequately compensate, undesirable work transfers, and denial of preferred job assignments are discrete acts and cannot be considered as part of an ongoing pattern or policy of discrimination." *Id.* at 628.  In such cases, "each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice." *Id.* (quoting *Morgan*, 536 U.S. at 114).

Because the alleged discriminatory acts that occurred prior to December 2, 2012 are time-barred, the only acts that took place within the relevant time period are the refusal to give Palak a salary increase in 2013 and the 2013 annual performance evaluation. *See* Pl. Dep. at 105-106, 214.

2. *Palak Has Not Made Prima Facie Showing of Discrimination*

Even if timely, Palak's claims fail because she has not met her burden of establishing a prima facie case of discrimination under Title VII or the ADEA.  First, she has provided no evidence that she suffered an adverse employment action.  "[A]n adverse employment action is a materially adverse change in the terms and conditions of employment." *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 211 (E.D.N.Y. 2014) (quoting *Mathirampuzha v. Potter*, 548 F.3d 70, 78 n.7 (2d Cir. 2008)).  "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits,

significantly diminished material responsibilities, or other indices unique to a particular situation." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (alteration, citation and internal quotation marks omitted). Palak was not fired, disciplined or demoted. She did not experience a decrease in salary or receive a less distinguished title. She was not denied material benefits, nor were her responsibilities as a CCP diminished. When asked at her deposition whether she was ever disciplined or suspended, she said that it was just her performance evaluations that were bad. *See* Pl. Dep. at 43. However, "unjustified criticism and negative evaluations . . . do not constitute adverse employment actions unless they [lead] to a change in the conditions of employment." *Meder v. City of New York*, No. 06-CV-504 (JG)(VVP), 2007 WL 2937362, at *8 (E.D.N.Y. Oct. 9, 2007). No adverse consequences flowed from any of Palak's self-professed "bad" evaluations, nor did she experience any changes in the conditions of employment after the evaluations. Indeed, Palak's assertion that there were four mass lay-offs during the time she worked at the Hospital, but that she was never laid off because she was a good employee, supports the Hospital's contention she was not subject to adverse employment actions. *See* Pl. Dep. at 89, 101-109.

The only actions that could conceivably be construed as adverse are that Palak was not hired for a PCA position (which is time-barred) and that she did not receive a salary increase in 2013. She has failed, however, to show discriminatory animus in rejecting her applications for a PCA position. Keenan endorsed her applications and was not a part of the hiring process for other the departments. In fact, Palak was not extended offers because there were better qualified candidates for the positions. With regard to the PCA position in the 2 East Unit that she applied for in October 2013, the Hospital had already filled it when Palak applied. Thus, her failure to promote claims fail as a matter of law.

The fact that Palak did not receive a salary increase in 2013 cannot sustain a claim of discrimination because there is no dispute that the denial was warranted based on Palak's performance ratings. Furthermore, this does not constitute a "change" in her conditions of employment in the way that a salary decrease would, and thus cannot be characterized as an adverse employment action. Finally, the denial of a transfer to a comparable CCP position and the Hospital's various alleged slights, such as a delay in receiving time off to attend her daughter's military promotion (which she ultimately received), are not actions that rise to the level of an adverse employment action because they did not materially alter the conditions of her employment.[4] Neither does being assigned to empty bed linens. *See Rodriguez v. Coca Cola Refreshments USA, Inc.*, No. 12-CV-234, 2013 WL 5230037 (BMC), at *3 (E.D.N.Y. Sept. 16, 2013) (collecting cases) ("[A]ssignments that are part of an employee's normal responsibilities are not 'adverse employment actions' where . . . the rate of pay and benefits remains the same.").

a.  *National Origin Discrimination*

Even if Palak had succeeded in establishing that the denial of a salary increase or the 2013 evaluation were adverse employment actions, she cannot establish a prima facie claim of national origin discrimination because she cannot link these actions (or any others for that matter) "to circumstances giving rise to an inference of discrimination." *See Chan*, 2014 WL at *23. The only allegation that remotely approaches national origin discrimination stems from Smith's mimicking of Palak's accent in Keenan's presence, and Keenan giggling, in 2011. These actions (which I assume are true and acknowledge are reprehensible) simply do not create a plausible inference that Palak was discriminated against based on her national origin. The challenged conduct was engaged in by a non-decision-making co-worker, and it occurred two

---

[4]  To the extent Palak alleges the Hospital denied her time off under the Family Medical Leave Act ("FMLA") it was not applicable under Palak's circumstances because her daughter was not on active duty or about to be deployed. *See* Gegwich Aff., Ex. H (H.R. Pol'y & Proc. Manual).

years before Palak was denied a salary increase. *See Howard v. City of New York*, No. 14-CV-409, 2015 WL 895430, at *2 (2d Cir. Mar. 4, 2015) (alleged comment made my employee with no decision-making authority made over ten months before the adverse action did not create plausible inference of race discrimination). Furthermore, courts have found the mimicking of a plaintiff's accent on a random occasion insufficient to support an inference of discrimination under the *McDonnell* framework. *See Chan*, 2014 WL at *23; *Bellom v. Neiman Marcus Grp., Inc.*, 975 F. Supp. 527, 532 (S.D.N.Y. 1997) (finding the alleged mimicking of plaintiff's accent on one or two occasions insufficient to establish a claim of discrimination on the basis of national origin). Finally, Palak has not shown a connection between Smith's mimicking in 2011 and the decision by another Hospital employee not to increase her salary in 2013 or the 2013 evaluation two years later.

                        b.      *Age Discrimination*

Palak cannot link any of the actions she argues were adverse to circumstances giving rise to an inference of age discrimination. Her claim of age discrimination is based on two comments allegedly made about Laskin, another CCP. These comments cannot plausibly be linked to any of the decisions not to hire Palak for a PCA position (which are untimely), decisions that were made prior to the time of the alleged comments. Nor can she show a connection between the comments and the Hospital's decision not to increase her salary in 2013; Rogan made the determination in January 2013, months before Palak alleges the comments were made. *See* Rogan Aff., Ex. A. While her 2013 evaluation was prepared after the comments were made, the fact that Keenan, Gunaydin and Rice were also in their forties undermines the already weak inference that the comments about Laskin had any relationship to Palak's evaluation. *See Chan*, at *23.

Palak has not met her burden of putting forth evidence from which a jury could infer that she experienced a materially adverse employment action or that the alleged actions give rise to an inference of discrimination, as required under Title VII.  Thus, the Hospital's motion for summary judgment on the claims of discrimination under Title VII and ADEA is granted.

3.    *Retaliation*

Palak's meetings with O'Brien to complain about her performance evaluations focused on exactly that – the evaluations.  She did not allege discrimination or harassment on the bases of national origin or age at those meetings.  While her December 2012 complaint alleged "retaliation" and "hostile work environment," she did not attribute the alleged retaliation to her status as a member of a protected class or to any complaints of discrimination.  *See* O'Brien Aff., Ex. N; Pl. Dep. at 257-58.  Thus, the Hospital could not have retaliated against Palak for engaging in protected activity; Palak never complained of discrimination or harassment based on national origin or age.

The first point at which Palak engaged in a protected activity that the Hospital knew of was in September of 2013, when she filed her NYSDHR complaint.  However, as discussed above, Palak did not suffer any adverse employment actions by the Hospital afterwards, and the actions she points to as adverse cannot be construed as such.  For example, Palak received her 2013 performance evaluation in January of 2014, *after* she had filed her NYSDHR complaint.  The 2013 evaluation, however, was better than the ones for the previous two years (she received a rating of 2.8, as opposed to 2.2 and 2.3 in 2011 and 2012, respectively).  No inference of retaliation can reasonably be drawn from those facts.  *See, e.g.*, *Lessambo v. Pricewaterhouse Coopers, L.P.*, No. 08-CV-6272 (WHP), 2010 WL 3958787, at

*13 (S.D.N.Y. Sept. 27, 2010), *aff'd*, 451 Fed. App'x 57 (2d Cir. 2011) (finding no causation where negative performance reviews were issued before and after protected activity). The denial of a salary increase, failure to promote, and delay in receiving time off all occurred prior to the time Palak filed her NYSDHR complaint, and she therefore cannot show a causal connection between any of these actions and her protected activity.

    4.    *Hostile Work Environment*

        Palak alleges that she was subjected to a hostile work environment because of various actions by the Hospital. Specifically, she contends that the accent mimicking, a comment by a co-worker (referring to her as a "jerk"), being asked to empty bed linens, the poor performance evaluations, and yelling and face-making by her supervisors contributed to a hostile work environment. *See* SAC ¶¶ 4, 7, 8(2)-(4)(a)-(o); Pl. Dep. at 238. While Palak may subjectively feel that the work environment at the Hospital was a hostile one, her subjective belief is not enough. Even if true, the actions she cites are not so severe or pervasive that they create an objectively hostile or abusive work environment. *See Richardson*, 180 F.3d at 436. The conduct involving the comments was not frequent – she alleges three instances over the course of her five year employment when other employees made harassing comments or gestures. This is not sufficiently severe to establish a hostile work environment, as "the harassment must be continuous and concerted not merely episodic." *See White v. Andy Frain Servs., Inc.*, No. 12-CV-5868 (JG)(VVP), 2014 WL 3896066, at *9 (E.D.N.Y. Aug. 8, 2014) (internal quotation marks and citation omitted). While the comments or gestures are certainly not appropriate, the reality is that "many bosses [and co-workers can be] harsh, unjust, and rude, but . . . this fact alone is insufficient to create a hostile work environment." *Chukwueze v. New York City Emps. Ret. Sys.*, 891 F. Supp. 2d 443, 454 (S.D.N.Y. 2012) (quoting *Alfano*, 294 F.3d

at 377). Furthermore, the actions were not in any way physically threatening or humiliating, but rather fall in the category of mere utterances. Lastly, other than the alleged accent-mimicking in 2011, the actions complained of do not indicate that they were motivated by discriminatory or retaliatory animus. None of the comments or actions refer to Palak's national origin, age or complaints of discrimination and thus cannot support a claim of a hostile work environment. *See Petrisch v. HSBC Bank USA, Inc.*, No. 07-CV-3303 (KAM)(JMA), 2013 WL 1316712, at *13 (E.D.N.Y. Mar. 28, 2013).

   5.   *False Imprisonment*

   Palak cannot make out a claim of false imprisonment against the Hospital because she has not shown that Gunaydin intended to confine her during the January 2014 meeting. The events as described by Palak suggest that Gunaydin was acting in her role as supervisor and attempting to relay the content of the 2013 evaluation to Palak. The conversation focused on her performance. Palak alleges that she stood up possibly twice and asked to leave. Gunaydin told her the meeting was not over and she sat back down – indicating that Palak consented to being in the office. Palak does not allege that she demanded to leave, or that Gunaydin told her she could not leave or physically restrained her in any way. The fact that the office was small and Gunaydin was positioned between Palak and the door is not sufficient to establish that Gunaydin intended to confine Palak. In sum, Palak has not established that Gunaydin intended to confine her or that she did not consent to the confinement (*i.e.*, being in the office).

## CONCLUSION

For the reasons stated above, the Hospital's motion for summary judgment is granted in its entirety, and Palak's cross-motion is denied.

So ordered.

John Gleeson, U.S.D.J.

Dated: June 12, 2015
      Brooklyn, New York